No. 23-2297

# In the United States Court of Appeals for the Fourth Circuit

FRANK HARMON BLACK AND
SOUTHEAST INVESTMENTS, N.C., INC.,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

*and*

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

*Intervenor.*

On Petition for Review of the Decision and Order of the
Securities and Exchange Commission Under 15 U.S.C. § 78y(a)(1)

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

Andrew J. Morris (*Counsel of Record*)
Russell G. Ryan
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Ste. 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, *amicus curiae* the New Civil Liberties Alliance states that it is a nonprofit organization under the laws of the District of Columbia; that it has no parent corporation and no publicly held corporation owns 10 percent or more of its stock; and that, to its knowledge, no publicly held corporation is a party to this case or has any direct financial interest in its outcome.

July 6, 2026

/s/ *Andrew J. Morris*
Andrew J. Morris

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF CONTENTS .....................................................................ii

TABLE OF AUTHORITIES.................................................................. iii

INTEREST OF *AMICUS CURIAE*.......................................................... 1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ....................................................................................4

    I.   RELEVANT BACKGROUND ...................................................... 4

    II.  THE "PRIVATE NONDELEGATION DOCTRINE" ...................................8

    III. FINRA EXERCISES VAST EXECUTIVE POWER WITH VIRTUALLY NO MEANINGFUL SEC SUPERVISION OR DIRECTION............................. 12

    IV. FINRA'S AND SEC'S UNCONSCIONABLE ADMINISTRATIVE DELAY WARRANTS SETTING ASIDE SEC'S AFFIRMANCE OF FINRA'S SANCTIONS ....................................................................21

CONCLUSION .................................................................................34

CERTIFICATE OF COMPLIANCE.........................................................35

CERTIFICATE OF SERVICE...............................................................36

**Page(s)**

**Cases**

*Alpine Secs. Corp. v. FINRA,*
121 F.4th 1314 (D.C. Cir. 2024) ............................... 4, 5, 14, 16, 20, 21

*Ass'n of Am. R.R.s v. Dep't of Transp.,*
721 F.3d 666 (D.C. Cir. 2013).................................................... 9, 10, 13

*Ass'n of Am. R.R.s v. Dep't of Transp.,*
821 F.3d 19 (D.C. Cir. 2016) ..................................................................9

*Axon Enter., Inc. v. FTC* and *SEC v. Cochran,*
598 U.S. 175 (2023) ...............................................................................23

*Caperton v. A.T. Massey Coal Co.,*
556 U.S. 868 (2009) ...............................................................................26

*Charlton v. FTC,*
543 F.2d 903 (D.C. Cir. 1976)................................................................7

*Crowe v. Smith,*
261 F.3d 558 (5th Cir. 2001) ..................................................................7

*Dep't of Enf't v. Morgan Stanley DW Inc.,*
No. CAF000045, 2002 WL 1840813 (NASD Nat'l Adjudicatory
Council July 29, 2002)...........................................................................27

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
575 U.S. 43 (2015) .............................................................................9, 13

*In re Beyn,*
SEC Rel. No. 34-97325 (Apr. 19, 2023).............................................12

*In re Finn,*
No. 22-11092, 2023 WL 5193517 (5th Cir. Aug. 14, 2023) ...................7

*In re Fisher,*
179 F.2d 361 (7th Cir. 1950) ..................................................................7

*In re Liotti,*
667 F.3d 419 (4th Cir. 2011) ..................................................................7

*In re Ruffalo,*
  390 U.S. 544 (1968) ...............................................................................7

*In re Thalheim,*
  853 F.2d 383 (5th Cir. 1988) ................................................................7

*Jones v. SEC,*
  115 F.3d 1173 (4th Cir. 1997) ...........................................................12

*Kim v. FINRA,*
  698 F. Supp. 3d 147 (D.D.C. 2023)............................................... 14, 15

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
  178 F.4th 224 (5th Cir. 2026).......................................................... 10, 11

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio,*
  301 U.S. 292 (1937) .............................................................................26

*Scottsdale Capital Advisors Corp. v. FINRA,*
  581 U.S. 940 (2017) .............................................................................13

*Scottsdale Capital Advisors Corp. v. FINRA,*
  844 F.3d 414 (4th Cir. 2016) ......................................................... 13, 14

*Scottsdale Capital Advisors Corp. v. FINRA,*
  678 F. Supp. 3d 88 (D.D.C. 2023).......................................................15

*Smith v. SEC,*
  178 F.4th 312 (6th Cir. 2026)................................................... 4, 12, 25

*Sunshine Anthracite Coal Co. v. Adkins,*
  142 S. Ct. 1308 (2022) ................................................................... 10, 13

*Texas v. Comm'r of Internal Revenue,*
  142 S. Ct. 1308 (2022) .........................................................................9

*United States v. Brown,*
  72 F.3d 25 (5th Cir. 1995) ...................................................................7

**Statutes**

5 U.S.C. § 3331 .......................................................................................5

5 U.S.C. § 555(b)...................................................................................28

5 U.S.C. § 706(1)...................................................................................28

15 U.S.C. § 78f ........................................................................ 27

15 U.S.C. § 78o(b)(8) ................................................................. 6

15 U.S.C. § 78o-3(b)(7) ............................................................. 6

15 U.S.C. § 78o-3(b)(8) ........................................................... 27

15 U.S.C. § 78s(b) ............................................................... 7, 13

15 U.S.C. § 78s(b)(2)(D) .......................................................... 14

15 U.S.C. § 78s(c) .................................................................... 13

15 U.S.C. § 78s(d)(2) .......................................................... 17, 25

15 U.S.C. § 78y ........................................................................ 19

15 U.S.C. § 78y(a)(3) ............................................................... 33

**Other Authorities**

AM. BAR ASS'N,
    STANDARDS FOR IMPOSING LAWYER SANCTIONS § 1.3 ........................... 7

Andrew Ceresney,
    Remarks to the American Bar Association's Business Law Section
    Fall Meeting (Nov. 21, 2014) ................................................. 23

Comm'r Mary L. Shapiro,
    SEC TASK FORCE ON ADMIN. PROCS.,
    FAIR AND EFFICIENT ADMINISTRATIVE PROCEEDINGS: REPORT OF THE
    TASK FORCE ON ADMINISTRATIVE PROCEEDINGS OF THE UNITED STATES
    SECURITIES AND EXCHANGE COMMISSION (1993) ................................ 30

FINRA Regulatory Notice No. 09-17,
    *FINRA Provides Guidance on Its Enforcement Process*
    (Mar. 18, 2009) ............................................................. 16

FINRA,
    *Enforcement* ............................................................... 8

FINRA,
    *Preparing for a FINRA Cycle Examination* .................................. 8

FINRA,
    *Rule Filings* .............................................................. 7

FINRA,
*Statistics* ................................................................. 6, 8, 18

*In re Jeffrey Ainley Hayden*,
Exchange Act Release No. 42772, 2000 WL 649146 (May 11, 2000) ..27

*In re Pending Administrative Proceedings*,
Exchange Act No. 97640 (June 2, 2023) ........................................22

*In re William H. Murphy & Co.*,
SEC Release No. 90759, 2020 WL 7496228 (Dec. 21, 2020) ..............12

Jeff Kern & Rena Andoh,
*FINRA Enforcement Actions—Who's Afraid of the Big Bad Wolf?*,
INSIGHTS, Sep. 2016, at 8..................................................................18

Jessica Hopper,
*Working on the Front Lines of Investor Protection:*
*How a FINRA Enforcement Action Becomes a FINRA Enforcement*
*Action*, FINRA NewsBlog (June 4, 2020)..........................................16

Letter from Marcia E. Asquith, Senior Vice President & Corp. Sec'y,
FINRA, to Brent J. Fields, Sec'y, SEC (Nov. 24, 2015) ......................18

Mem. from The Comm'n to Geovanni Prezioso, OGC, Regarding Policy
for Accelerating the Admin. Procs. Process (June 9, 2003).................32

*Metatron, Inc.*,
Exchange Act Release No. 99429 (Jan. 25, 2024)..............................30

Philip Hamburger,
*Nondelegation Blues*,
91 GEO. WASH. L. REV. 1083 (2023)..................................................10

*Robbi J. Jones*,
Exchange Act Release No. 103388 (July 3, 2025)..............................29

*Robert R. Tweed*,
Exchange Act Release No. 99136 (Dec. 11, 2023)..............................30

Russell G. Ryan,
*Quasi-Governmental Prosecution After Jarkesy*, 23 GEORGETOWN J. L.
& PUB. POLICY 311 (2025)........................................................... 4, 5, 6

Russell G. Ryan,
*Welcome to the SEC's Hotel California*, LinkedIn (Nov. 29, 2022) ..... 22

*Scottsdale Capital Advisors Corp.*,
Exchange Act Release No. 92940 (Sep. 10, 2021) ................................ 30

SEC Press Rel. No. 2023-154,
*SEC Adopts Amendments to Exemption from National Securities
Association Membership* (Aug. 23, 2023) ............................................... 6

SEC,
REPORT ON ADMINISTRATIVE PROCEEDINGS FOR THE PERIOD OCTOBER 1,
2025 THROUGH MARCH 31, 2026, EXCHANGE ACT RELEASE NO. 105337
(Apr. 30, 2026) ...................................................................................... 18

*Southeast Investments, N.C., Inc.*,
Exchange Act Rel. No. 98996 (Nov. 20, 2023) .................................... 29

THE FEDERALIST No. 51 ................................................................................ 9

*Titan Sec.*,
Exchange Act Release No. 104878 (Feb. 23, 2026) ............................. 29

*Wilson-Davis & Co.*,
Exchange Act Release No. 99099 (Dec. 6, 2023) ................................. 30

**Rules**

FINRA Rule 8210 ........................................................................................ 15

FINRA Rule 9552 ........................................................................................ 15

**Regulations**

17 C.F.R. § 200.30-3 ................................................................................... 14

17 C.F.R. § 201.420(d) ............................................................................... 25

17 C.F.R. § 201.900(a)(1)(iii) .................................................................... 28

17 C.F.R. § 201.900(a)(1)(iv) .................................................................... 29

**INTEREST OF *AMICUS CURIAE*[1]**

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself: jury trial, due process of law, the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels, and the right to have executive powers exercised only by actors accountable to the President, some of which are at stake in this appeal. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—because Congress, federal administrative agencies, and even sometimes the courts have neglected them for so long.

NCLA defends civil liberties primarily by asserting constitutional constraints on the administrative state. Although Americans still enjoy

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional administrative state is the focus of NCLA's concern.

NCLA is particularly disturbed when the government empowers private actors with vast executive discretion and muscle to enforce federal law through investigation, prosecution, and punishment, but does not ensure that those private actors are answerable to the President— nor even closely supervised by any governmental officers. That situation exists here, where Congress and Respondent Securities and Exchange Commission ("SEC") have empowered Intervenor Financial Industry Regulatory Authority ("FINRA") to investigate, prosecute, and punish securities brokers for violating federal securities laws and rules without any meaningful direction or supervision by SEC, much less by the President. As explained herein, this empowerment of private law enforcement without close supervision by accountable Executive Branch officers violates Article II of the Constitution, profoundly conflicts with our constitutional design, and presents a grave threat to civil liberties.

NCLA is also disturbed when government agencies delay and effectively deny Americans' prompt access to federal courts for vindication of their rights. As discussed in this brief, the administrative adjudication on review in this case presents an egregious example of such unlawful agency delay, which this Court has the opportunity to rectify.

## SUMMARY OF ARGUMENT

FINRA's investigative, disciplinary, and adjudicative system violates the Constitution's private-nondelegation prohibition because SEC provides no meaningful direction, surveillance, or supervision when FINRA performs these functions. FINRA and SEC also routinely violate the constitutional, statutory, and regulatory rights of FINRA enforcement targets like Petitioners Frank Black and Southeast Investments, N.C. by depriving them of any semblance of timely decision making. Instead, it condemns them to an absurdly protracted regulatory gauntlet that appears purposefully designed to impoverish and demoralize them before they ever get a chance to seek review by an Article III court.

The instant petition—involving minor regulatory missteps dating back *10 to 15 years*, with no allegations of securities fraud or investor losses—presents a textbook example of these constitutional defects, and thus an ideal vehicle for this Court to take corrective action by sending these regulators an unambiguous message of judicial rebuke. The Court should set aside SEC's final order affirming FINRA's sanctions against Petitioners and direct SEC to cancel those sanctions.

## ARGUMENT

### I. RELEVANT BACKGROUND

FINRA is an ostensibly private, nonprofit corporation that regulates the securities brokerage industry subject to SEC oversight. Its board members, officers, and employees are all private citizens who are neither appointed nor (with limited exceptions) removable by any governmental official. *See generally Smith v. SEC*, 178 F.4th 312, 319 (6th Cir. 2026); *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1321-22 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025); Russell G. Ryan, *Quasi-Governmental Prosecution After Jarkesy*, 23 GEORGETOWN J. L. & PUB. POLICY 311, 314-17 (2025). FINRA also unilaterally sets its own

4

budget and staff salaries and receives no government funding.  *See Alpine*, 121 F.4th at 491.

As nominally private actors then, FINRA and its personnel are exempt from most of the basic checks, balances, and transparency requirements designed to protect individuals from overzealous governmental coercion and punishment.  For example, FINRA and its personnel are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, or countless other laws applicable to traditional government regulators.  *See* Ryan, 23 GEORGETOWN J. LAW & PUB. POLICY at 313-14.  And unlike their governmental counterparts, as best as *amicus curiae* can determine, despite wielding vast legislative and executive power, none of FINRA's board members, officers, or employees must take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same."  5 U.S.C. § 3331.

As the only SEC-registered "national securities association," FINRA wields vast and monopolistic legislative, executive, and adjudicatory powers over more than 3,000 broker-dealer firms and more

than 600,000 individual brokers (also known as "registered representatives") operating within the securities industry. *See* FINRA, *Statistics*, www.finra.org/media-center/statistics (hereinafter "FINRA Statistics"); Ryan, 23 GEORGETOWN J. LAW & PUB. POLICY at 314-15. Federal law requires most broker-dealer firms to become members of FINRA and thereby subject themselves to FINRA's regulatory jurisdiction. 15 U.S.C. § 78o(b)(8); *see also* SEC Press Rel. No. 2023-154, *SEC Adopts Amendments to Exemption from National Securities Association Membership* (Aug. 23, 2023) (further narrowing the sliver of broker-dealer firms exempt from mandatory FINRA membership). Federal law also requires FINRA to maintain rules to ensure that when its member firms or their brokers violate federal securities law or rules, they "shall be appropriately disciplined … by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction." 15 U.S.C. § 78o-3(b)(7).[2]

---

[2] Federal courts have characterized comparable sanctions in attorney-discipline cases as "quasi-criminal" in nature, *see, e.g., In re Ruffalo*, 390

Although not an official agency or department of the federal government, FINRA exercises significant legislative power by promulgating rules applicable to the securities brokerage industry, most of which become legally binding on regulated parties only upon SEC approval after public notice and comment. *Id.* § 78s(b). In a typical year, FINRA promulgates a few dozen new rules that affect its member firms and their brokers. *See* FINRA, *Rule Filings*, finra.org/rules-guidance/rule-filings (listing new rule proposals filed with SEC). Each year FINRA also conducts more than two thousand examinations of securities firms and brokers for compliance with federal securities laws

---

U.S. 544, 551 (1968); *In re Finn*, No. 22-11092, 2023 WL 5193517, at *2 (5th Cir. Aug. 14, 2023) (quoting *United States v. Brown*, 72 F.3d 25, 29 (5th Cir. 1995))—*i.e.*, sufficiently severe to require proof of misconduct by "clear and convincing evidence," *see, e.g.*, *In re Liotti*, 667 F.3d 419, 426 (4th Cir. 2011) (citation omitted); *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) (citing *In re Thalheim*, 853 F.2d 383, 389 n.9 (5th Cir. 1988)); *In re Fisher*, 179 F.2d 361, 369 (7th Cir. 1950) (citation omitted); *accord* AM. BAR ASS'N, STANDARDS FOR IMPOSING LAWYER SANCTIONS § 1.3. By contrast, FINRA imposes disciplinary sanctions using the threadbare "preponderance of evidence" standard, which one court has aptly described as the "rock-bottom," lightest evidentiary burden, typically applied in mine-run civil cases. *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976).

and rules.  *See* FINRA, *Preparing for a FINRA Cycle Examination,* finra.org/sites/default/files/Education/p038336.pdf.

FINRA also exercises vast executive power by investigating, prosecuting, and punishing securities brokers and firms suspected of violating federal securities laws and rules, including both SEC's and FINRA's rules.  *See* FINRA, *Enforcement*, https://www.finra.org/rules-guidance/enforcement.  In this role, deploying its 350-person enforcement staff, FINRA investigates and imposes disciplinary sanctions against several hundred or more member firms and brokers each year.  *See* FINRA Statistics.  In a typical year, FINRA imposes anywhere from $50 million to $150 million in aggregate fines and restitution awards while suspending, barring, or expelling from the securities industry more than 500 brokers—far more than SEC itself does—and occasionally doing the same to entire firms.  *See id.*

## II.    THE "PRIVATE NONDELEGATION DOCTRINE"

In a series of cases involving the nominally private operator of the Amtrak train system and other private regulators, the D.C. Circuit has "detailed extensively why private entities cannot wield the coercive

power of government." *Ass'n of Am. R.R.s v. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016) ("*Amtrak III*") (citing and reaffirming relevant holding of *Ass'n of Am. R.R.s v. Dep't of Transp.*, 721 F.3d 666, 670-74 (D.C. Cir. 2013) ("*Amtrak I*")). "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Id.* at 880 (citing THE FEDERALIST No. 51); *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) ("*Amtrak II*") (Alito, J., concurring) ("When it comes to private entities, … there is not even a fig leaf of constitutional justification" for delegating regulatory power).

Starting from this foundational principle, courts have developed something called the "private nondelegation doctrine," which at least three Supreme Court justices have signaled the need to fortify through an appropriate future case. *Texas v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) (statement of Justice Alito, joined by Justices Thomas and Gorsuch, respecting denial of certiorari). In short, the doctrine generally forbids delegation of government power to a private actor unless the private actor operates subordinately—or "as an aid"—to a

governmental actor and subject to that governmental actor's "pervasive surveillance and authority." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 388 (1940); *see also Carter Coal*, 298 U.S. at 311; *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 233, 246-47 (5th Cir. 2026).

Cases in this area have typically focused on the participation of private actors in promulgating legislative rules that bind a particular industry rather than on the private actors' investigation and punishment of rulebreakers. *See, e.g.*, *Adkins*, 310 U.S. 381; *Carter Coal*, 298 U.S. 238; *Amtrak I*, 721 F.3d 666.[3] Indeed, in most cases it appears the relevant private regulator lacked any enforcement powers at all. In other cases, constitutional scrutiny of the private entity's enforcement powers was premature because the private regulator was only a recent creation

---

[3] For this reason, courts typically invoke the nomenclature of "nondelegation," but *amicus curiae* respectfully suggests that is a misnomer when extended to analyzing a private regulator's exercise of *executive* power. Whereas Congress possesses legislative power under Article I of the Constitution, Congress possesses no executive power under Article II, and thus cannot "delegate" it. *See generally* Philip Hamburger, *Nondelegation Blues*, 91 GEO. WASH. L. REV. 1083, 1169-72 (2023) (urging a focus on "vesting" rather than "delegation").

and had not yet taken steps to establish its enforcement system, much less to investigate or punish anyone. *See, e.g., Oklahoma v. United States*, 62 F.4th at 231-33. *But see Nat'l Horsemen's Benevolent & Protective Ass'n*, 178 F.4th at 230, 241-44 (finding facial challenge ripe for decision on the merits).[4]

Here, by contrast, FINRA's long-established, prolific, and punitive enforcement regime is front and center—and ripe for constitutional scrutiny in the context of a completed administrative enforcement case.

---

[4] In one such case, the court in dictum helpfully suggested certain oversight techniques that a supervisory government agency might adopt to minimize private nondelegation concerns. For example, the court hypothesized that the agency "could issue rules protecting covered persons from overbroad subpoenas or onerous searches;" "could require that the [subordinate private regulator] provide a suspect with a full adversary proceeding … with free counsel;" and "could require that the [subordinate private regulator] meet a burden of production before bringing a lawsuit or preclear the decision with the [government agency]." *Oklahoma v. United States*, 62 F.4th at 231. Notably, SEC applies none of these hypothetical oversight techniques to FINRA's investigative and enforcement proceedings.

## III. FINRA EXERCISES VAST EXECUTIVE POWER WITH VIRTUALLY NO MEANINGFUL SEC SUPERVISION OR DIRECTION

In *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997), this Court characterized FINRA's predecessor entity, the National Association of Securities Dealers, as a private corporation and not a governmental agency. *Accord In re Beyn*, SEC Rel. No. 34-97325, at 24 n.86 (Apr. 19, 2023) (citing *In re William H. Murphy & Co.*, SEC Release No. 90759, 2020 WL 7496228, at *17 (Dec. 21, 2020)). *Amicus curiae* therefore assumes for purposes of this brief that FINRA is a private actor.[5]

As discussed in the preceding section of this brief, the Constitution prohibits private actors from exercising binding government powers lawfully exercised by governmental actors, especially in the absence of meaningful governmental supervision. Yet private actor FINRA routinely exercises core executive powers—such as investigating, prosecuting, and punishing other private citizens and businesses for

---

[5] If FINRA is not a private actor but rather a government actor, then it should absolutely be subject to the same constitutional requirements and restrictions as any other government agency. *See, e.g., Smith v. SEC*, 178 F.4th 312  325-28 (6th Cir. 2026) (dictum).

alleged violations of federal law and related rules—with *zero* real-time governmental direction, supervision, or oversight. That cannot stand.

In one respect—FINRA's exercise of legislative power through rulemaking—FINRA is subject to *some* degree of direct, real-time SEC supervision. As previously noted, with exceptions not relevant here, FINRA rules do not become effective or binding on regulated parties unless and until SEC pre-approves them, and SEC retains plenary authority to amend those rules on its own. 15 U.S.C. § 78s(b),(c); *see also Scottsdale Capital Advisors Corp. v. FINRA*, 844 F.3d 414, 417 (4th Cir. 2016), *cert. denied*, 581 U.S. 940 (2017) ("*Scottsdale I*"). Similar governmental supervision of private lawmaking through agency pre-approval has been deemed sufficient to remove any constitutional infirmity, especially where the private regulator is otherwise subject to the agency's "pervasive surveillance and authority." *Adkins*, 310 U.S. at 388, 399 (1940); *see also Amtrak I*, 721 F.3d at 671 (quoting *Adkins*), *vacated and remanded on other grounds*, 575 U.S. 43 (2015).[6]

---

[6] That said, even SEC's supervision of FINRA rulemaking is far from "pervasive." Many (and likely most) FINRA rules are reviewed and

But SEC exercises *no* comparable pre-approval or "pervasive surveillance" when FINRA exercises its quintessentially *executive* powers to investigate, prosecute, and punish alleged violators of federal securities laws and rules. Whenever FINRA exercises these enforcement powers, SEC's role is entirely after the fact, not unlike this Court's role in reviewing SEC's final order in this case. *See Scottsdale I*, 844 F.3d at 418 (noting that only an after-the-fact appeal from a *final* FINRA disciplinary sanction "invokes the SEC's role under the Exchange Act in overseeing FINRA's authority to discipline members"); *Alpine*, 121 F.4th at 1343-44 (Walker, J., concurring in part) (listing 13 executive actions FINRA can take, "all without government oversight"); *Kim v. FINRA*, 698 F. Supp. 3d 147, 158 (D.D.C. 2023) ("Other than serving as a level of review after a hearing, the SEC plays no active role in FINRA's enforcement proceedings."), *appeal dismissed*, No. 23-7136, 2025 WL 313965 (January 27, 2025).

---

approved not by SEC's presidentially appointed commissioners but rather only by SEC staff acting pursuant to delegated authority. *See generally* 17 C.F.R. § 200.30-3(a)(12) and (57)-(59). Moreover, certain FINRA rules can take binding effect with the passage of time if SEC simply takes no action. *See, e.g.*, 15 U.S.C. § 78s(b)(2)(D).

For example, FINRA "alone determines which cases to investigate and when to file a complaint." *Scottsdale Capital Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88, 104 (D.D.C. 2023) *("Scottsdale II")*; *accord id.* at 96 ("investigations are done at FINRA's discretion, without any influence from the SEC or other branch of government"). Likewise, FINRA alone—with no pre-approval or direction from SEC—makes all discretionary executive decisions during its investigations and adjudications. For example, FINRA decides which brokers and firms to burden with investigative demands for documents and testimony (noncompliance with which can result in summary suspension from the industry, *see* FINRA Rules 8210 and 9552); how burdensome those demands will be; which brokers and firms will be charged with wrongdoing; what statutory and rule violations will be charged against them; whether to accept a settlement offer and on what terms; and what fines and other sanctions will be imposed. *See Kim*, 698 F. Supp. 3d at 158 ("FINRA decides whom to investigate, whom to bring charges against, what charges to bring, and what sanctions to seek."); Jessica Hopper, *Working on the Front Lines of Investor Protection: How a FINRA*

*Enforcement Action Becomes a FINRA Enforcement Action*, FINRA NewsBlog (June 4, 2020), www.finra.org/media-center/blog/working-on-the-front-lines-of-investor-protection-how-an-enforcement-action-becomes-an-enforcement-action (making no mention of SEC involvement or supervision); FINRA Regulatory Notice No. 09-17, *FINRA Provides Guidance on Its Enforcement Process* (Mar. 18, 2009) (detailing FINRA enforcement and disciplinary process with no mentioning of SEC involvement unless and until a respondent appeals to SEC after enduring the entire FINRA investigative, prosecutorial, and adjudicative process).

In a typical FINRA enforcement case, *all* these discretionary, career-altering, and often punitive executive decisions are made *solely* by the private citizens who work for and manage FINRA. Those decisions are made with no input, direction, or supervision from anyone at SEC, much less by the presidentially appointed and Senate-confirmed SEC commissioners, who are the only constitutionally appointed Principal Officers of the government anywhere in FINRA's vicinity. *See Alpine*, 121 F.4th at 1343-45 (Walker, J., concurring in part); *cf. Nat'l Horsemen's Benevolent & Protective Ass'n*, 178 F.4th at 239-40 (finding no meaningful

16

FTC supervision of quasi-governmental horseracing-industry regulator's enforcement functions). Indeed, with exceedingly rare exceptions, SEC commissioners are entirely oblivious to whom FINRA is investigating or prosecuting unless and until FINRA concludes an entire enforcement matter by imposing a disciplinary sanction. Even then, as a practical matter, the commissioners get involved only in the tiny fraction of FINRA enforcement cases that run their entire course through FINRA's costly, , protracted processes—including investigation, prosecution, disciplinary hearing, and internal FINRA appeals—and are then formally appealed to SEC's commissioners pursuant to Exchange Act § 19(d)(2), 15 U.S.C. § 78s(d)(2).[7]

The practical reality for nearly all brokers and firms whom FINRA investigates, prosecutes, and sanctions each year is that this theoretical, after-the-fact SEC review *never* happens. Nearly all FINRA enforcement cases prematurely end in settlements or defaults and are therefore *never*

---

[7] In theory, SEC can also review a final FINRA sanction "on its own motion" even if no respondent appeals, 15 U.S.C. § 78s(d)(2), but *amicus curiae* is not aware of SEC ever having done so and believes such cases, if any exist, are exceptionally rare.

formally reviewed by *anyone* at SEC, much less the commissioners themselves through a formal appeal. *See, e.g.*, Jeff Kern & Rena Andoh, *FINRA Enforcement Actions—Who's Afraid of the Big Bad Wolf?*, INSIGHTS, Sept. 2016, at 8, 10 ("the overwhelming majority of FINRA enforcement actions settle"). Very few FINRA investigative targets have the resources and fortitude to persevere through FINRA's entire enforcement gauntlet, so their disciplinary sanctions are typically imposed with no government surveillance or oversight whatsoever. *Compare* FINRA, *Statistics*, *supra* (reporting per-year enforcement case totals ranging from a low of 610 in 2023 to a high of 1,369 in 2017), *with* Letter from Marcia E. Asquith, Senior Vice President & Corp. Sec'y, FINRA, to Brent J. Fields, Sec'y, SEC, at 2 (Nov. 24, 2015) (reporting that over the preceding three-year period, only 32 FINRA cases were appealed to SEC), and SEC, REPORT ON ADMINISTRATIVE PROCEEDINGS FOR THE PERIOD OCTOBER 1, 2025 THROUGH MARCH 31, 2026, EXCHANGE ACT RELEASE NO. 105337, at 5 (Apr. 30, 2026) (reporting only 28 total appeals docketed from FINRA and all other securities industry self-regulatory

18

organizations *combined* during the 18-month period from October 1, 2025

through April 30, 2026).

As a practical result, of the many hundreds of enforcement cases

that private staff at FINRA investigates and prosecutes each year—

resulting in hundreds of punitive fines, industry bars, disrupted careers,

and damaged reputations—almost none are ever directed, supervised,

surveilled, or even reviewed after the fact by any constitutionally

appointed officer of the U.S. government.[8]  This after-the-fact appellate

review of a tiny percentage of FINRA final disciplinary orders each year

hardly constitutes "pervasive surveillance and authority" over FINRA's

enforcement regime—any more than this Court's appellate review of a

tiny percentage of SEC enforcement orders each year under 15 U.S.C.

§ 78y could plausibly be characterized as "pervasive surveillance and

---

[8] Adding insult to injury, even those rare brokers and firms who do appeal to SEC's commissioners after persevering through years of costly and stressful FINRA enforcement proceedings often wait several *additional* years before SEC decides their appeals.  Throughout all those years of investigation, prosecution, and appeal, most accused brokers remain largely unemployable in the securities industry (or, to a slightly lesser extent, anywhere else).  As discussed below in Section IV of the Argument, Petitioners' case provides a textbook example.

authority" over SEC's enforcement regime.  *See Alpine*, 121 F.4th at 1345 (Walker, J., concurring in part) (rejecting FINRA argument that SEC review "at the very end of the process" can cure SEC's lack of prior supervision); *cf. Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 240-41(5th Cir. 2026 ("It is no answer to say that the FTC can come in at the tail-end of this adversarial process and review the sanction.").

*     *     *     *

SEC simultaneously maintains that FINRA is not a state actor subject to constitutional limitations, yet that, as a private actor enforcing the law, FINRA satisfies the private nondelegation doctrine because it is subject to SEC's pervasive surveillance and supervisory authority.  *See Alpine*, 121 F.4th at 1351 (Walker, J., concurring in part) (criticizing FINRA's reliance on "a Goldilocks defense").  This game of "heads I win, tails you lose" is constitutionally untenable.  FINRA cannot have it both ways: It cannot evade the Constitution's appointment, removal, due process, and jury-trial requirements by claiming to be a private actor free of government entanglement, while at the same time evading the equally

important constitutional requirement mandating that private actors be subject to the "pervasive surveillance and authority" of governmental officers when they wield vast governmental powers otherwise exercisable only by government officials. *See id.* ("FINRA 'cannot have its cake and eat it too'" (quoting *Amtrak I,* 721 F.3d at 676)).

SEC plays no meaningful role in directing, supervising, or surveilling the overwhelming majority of FINRA's enforcement investigations and prosecutions, and plays only a limited, after-the-fact appellate role in the relatively few FINRA cases it reviews. For this reason, FINRA and its staff are wielding core executive power in violation of Article II of the Constitution and the private nondelegation doctrine.

## IV. FINRA'S AND SEC'S UNCONSCIONABLE ADMINISTRATIVE DELAY WARRANTS SETTING ASIDE SEC'S AFFIRMANCE OF FINRA'S SANCTIONS

SEC has a pervasive and recurring problem with its administrative adjudication docket: scandalous agency torpor when performing its statutory duty to decide appeals from punitive sanctions imposed by FINRA and other so-called self-regulatory organizations ("SROs") under SEC's purportedly pervasive regulatory supervision. SEC's chronic

adjudicative delays in this sphere systematically (and unlawfully) block securities firms and professionals who have been punished by the SROs—often severely, and *always* without a jury trial—from obtaining timely Article III judicial review of their punishments. SEC's persistent delays also violate regulated parties' rights to due process of law under the Fifth Amendment to the Constitution, to timely agency action under the Administrative Procedure Act ("APA"), and to their very reasonable expectation that SEC will comply with its own promulgated rules.[9]

SEC and other agencies have long assured courts and litigants that the notoriously paltry procedural rights they provide to American citizens in their home-court, pseudo-judicial administrative prosecutions are nothing to worry about. True, they concede, these tribunals deprive

---

[9] SEC had a substantially similar problem with administrative appeals from initial decisions issued by its own administrative law judges. It conveniently solved that problem in June 2023 by summarily dismissing dozens of such pending appeals, citing an internal "control deficiency"— really an egregious violation of due process of law—that had allowed SEC enforcement staff *ex parte* access to nonpublic adjudicative staff files. *See In re Pending Administrative Proceedings*, Exchange Act No. 97640 (June 2, 2023), https://www.sec.gov/files/litigation/opinions/2023/33-11198.pdf; Russell G. Ryan, *Welcome to the SEC's Hotel California*, LinkedIn (Nov. 29, 2022), available at https://www.linkedin.com/pulse/welcome-secs-hotel-california-russ-ryan/.

the accused of a jury trial and other basic due process protections taken for granted in real court proceedings. But those deprivations are worth it, they insist, because administrative adjudication is so much more streamlined and efficient, thereby producing prompter decisions.

For example, SEC's then-director of enforcement once assured securities attorneys that "administrative actions produce prompt decisions" and "timely public findings of fact and law," and "we can all agree that it is better to have rulings earlier rather than later." Andrew Ceresney, Remarks to the American Bar Association's Business Law Section Fall Meeting (Nov. 21, 2014), www.sec.gov/news/speech/2014-spch112114ac. But as the instant case and ample others demonstrate, SEC's adjudications produce neither "prompt" nor "earlier" rulings. *See*, *e.g.*, *Axon Enter., Inc. v. FTC* and *SEC v. Cochran*, 598 U.S. 175, 214 (2023) (Gorsuch, J., concurring) (recounting Michelle Cochran's yearslong battle through SEC's adjudicative morass).

The Petition in this case exemplifies the harsh reality that administrative adjudications often proceed *much more slowly* than the types of conventional lawsuits, in *real* courts of law, that the Founders

plainly contemplated—especially in cases where governmental agents prosecute private citizens and businesses for alleged lawbreaking. The FINRA case against the Petitioners—now finally on judicial review— arose from events dating back to 2010(!). After several years of FINRA inspection and investigation, FINRA filed formal charges against the Petitioners in September 2015, and it then took FINRA nearly four additional years to complete its disciplinary process. Petitioners promptly appealed to SEC in May 2019, and briefing of that appeal was completed by October 2019, but SEC did not decide the Petitioners' appeal until December 2023. Even then, it partially remanded the case to FINRA, so it took two *more* years before any court could review the merits in 2026. As discussed below, this kind of decade-long, non-judicial regulatory gauntlet is no outlier, but rather all too common.

SEC's chronic failure to timely perform the adjudicative duties assigned to it by Congress is unacceptable and inflicts prolonged financial and reputational harm on countless litigants who wait endlessly for decisions in their regulatory appeals from punitive SRO sanctions imposed against them. This dereliction of duty is especially disturbing

24

because some of the most severe SRO sanctions—including the permanent debarment of securities professionals from the industry—are not automatically stayed during the pendency of the litigant's appeal to SEC. *See* 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.420(d). Even worse, according to a recent Sixth Circuit decision, throughout SEC's prolonged period of post-briefing inactivity, litigants patiently awaiting SEC's decision must vigilantly monitor federal judicial developments to ensure that they don't overlook any ruling somewhere against SEC on a novel issue of potential relevance to their own pending appeal; if they "fail[] to bring the decision to the Commission's attention," they apparently risk being forever precluded from later relying upon the decision due to so-called administrative issue exhaustion. *Smith v. SEC*, 178 F.4th 312, 324 (6th Cir. 2026) (faulting Smith because he "neglected to bring to the SEC's attention" the Supreme Court's decision against *SEC v. Jarkesy*, 603 U.S. 109 (2024), a case to which SEC was a party and so was undoubtedly well aware of).

SEC's wholly unexplained, multi-year delay in deciding the Petitioners' administrative appeal from FINRA serves as a useful poster

child to illustrate the longstanding scandal that has infected a wide swath of the agency's adjudicative docket. SEC's prolonged inaction placed Petitioners in an interminable state of regulatory limbo: publicly branded by FINRA as serious securities-law violators; unable as a practical matter to continue operating in the securities industry; unable to achieve finality and repose with respect to FINRA's accusations and sanctions; and unable to obtain vindication or Article III judicial review while SEC refused to issue an appealable final order.

SEC's dithering deprived Petitioners of their constitutional and statutory rights to fair and timely adjudication. "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process,'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (alteration in original) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)), as well as an "inexorable safeguard" of individual liberty, *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (quoting *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 73 (1936)). In this regard, it has been acknowledged for centuries that "justice delayed is justice denied."

The Securities Exchange Act of 1934 (the "Exchange Act") similarly demands that SRO disciplinary proceedings—including the mandatory and exclusive appellate path up through SEC—offer regulated parties "a fair procedure." 15 U.S.C. § 78o-3(b)(8) (requirement for national securities associations, of which FINRA is the only one); *accord id.* § 78f(b)(7) (similar requirement for securities exchanges such as the New York Stock Exchange). And as SEC itself has acknowledged when rebuking the SROs for their own adjudicative delays, unreasonably prolonged regulatory enforcement proceedings deprive the accused of a fundamentally fair process within the meaning of this statutory command. *See Jeffrey Ainley Hayden*, SEC Exchange Act Release No. 42772, 2000 WL 649146, at *2 (May 11, 2000) (dismissing New York Stock Exchange disciplinary sanctions, imposed after five years of combined investigation and adjudication based on aged conduct, because "[w]e believe that the delay in the underlying proceedings was inherently unfair"); *accord Dep't of Enf't v. Morgan Stanley DW Inc.*, No. CAF000045, 2002 WL 1840813 at *11 (NASD Nat'l Adjudicatory Council July 29, 2002) ("Based on the totality of circumstances, including the

length of delay [more than five years of combined investigation and adjudication based on aged conduct] and harm to the respondents, we dismiss this action as being inherently unfair.").

SEC's adjudicative lassitude also makes a mockery of the APA's command that an agency "shall proceed to conclude a matter presented to it" within a "reasonable time" and without undue delay. 5 U.S.C. §§ 555(b), 706(1). SEC's delays likewise flout Rule 900(a)(1) of SEC's own rulebook which, as previously noted, codifies an expectation that appeals from SRO disciplinary sanctions will "ordinarily" be decided no later than 10 months after completion of briefing, even in the most complex cases. 17 C.F.R. § 201.900(a)(1)(iii).

In most of SEC's languishing appeals, including the Petitioners', the agency simply issues a succession of self-serving, perfunctory public orders extending its deadline to issue the final decision—usually for 90 days at a time. SEC began that practice in or about 2019, presumably to feign compliance with its Rule 900, which further provides that if SEC determines that its decision cannot be issued within the rule's

presumptive time limits, "the Commission may extend that period by orders as it deems appropriate in its discretion." *Id*. § 201.900(a)(1)(iv).

Since adopting this routine practice of issuing perfunctory extension orders to buy more time, SEC has liberally granted itself up to a dozen or more successive extensions in any given case. Petitioners' case was worse than usual, with SEC issuing an astonishing 24 such orders between August 2020 and November 2023.[10] Each order simply recited the rote boilerplate that "[t]he Commission has determined, in its discretion, that it is appropriate to extend … the period within which the decision in this matter may be issued." *E.g.*, *Southeast Investments, N.C., Inc.*, SEC Exchange Act Rel. No. 98996 (Nov. 20, 2023) (24th extension order over 36-month period).

Similar examples from contemporaneous cases are plentiful. *See, e.g.*, *Titan Sec.*, SEC Exchange Act Release No. 104878 (Feb. 23, 2026) (13th extension order over 38-month period); *Robbi J. Jones*, SEC Exchange Act Release No. 103388 (July 3, 2025) (14th extension order

---

[10] The full SEC appellate docket, including all 24 extension orders, is available at https://www.sec.gov/enforcement-litigation/administrative-proceedings/3-19185.

over 40-month period); *Metatron, Inc.*, SEC Exchange Act Release No. 99429 (Jan. 25, 2024) (13th extension order over 31-month period); *Robert R. Tweed*, SEC Exchange Act Release No. 99136 (Dec. 11, 2023) (17th extension order over 30-month period); *Wilson-Davis & Co.*, SEC Exchange Act Release No. 99099 (Dec. 6, 2023) (17th extension order over 35-month period); *Scottsdale Capital Advisors Corp.*, SEC Exchange Act Release No. 92940 (Sep. 10, 2021) (17th extension order over 24-month period).

SEC's docket backlog is also nothing new; this problem has bedeviled the agency for decades. In the early 1990s, for example, SEC's then-Chair Richard Breeden formed a task force to address the problem, acknowledging that "[m]any cases seemed to take an extremely long time to be completed, and a large backlog of increasingly old cases had built up for various reasons." Comm'r Mary L. Shapiro, SEC TASK FORCE ON ADMIN. PROCS., FAIR AND EFFICIENT ADMINISTRATIVE PROCEEDINGS: REPORT OF THE TASK FORCE ON ADMINISTRATIVE PROCEEDINGS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (1993) (introductory note preceding report). The task force's 390-page report

detailed SEC's chronic adjudicative delays, noting among other things that such delays have been a major concern at the agency since the 1960s. *Id.* at 33 at n.46. The report further acknowledged that, during SEC's 1992 fiscal year, "the average time from filing of the appeal to issuance of the opinion was 806 days," *id.* at 13-14, while later admitting that the total time from SEC's issuance of a briefing schedule order in cases on appeal *should* be "no more than nine months," *id.* at 16.

Ten years later, a 2003 memorandum from the agency's commissioners to its general counsel again acknowledged the importance of timely decision-making, but laid bare the persistently ugly reality:

> The Commission must lead by example and this means seriously tightening up the time frame from the date an appeal is taken from an ALJ or SRO decision to the time the Commission issues its Opinion. The major issue that must be addressed by the Office of the General Counsel (OGC) is the time it takes for OGC to do the necessary review of the record and briefs and submit a draft opinion to the Commission. …
>
> …
>
> While these matters take time, statistics show an inordinate amount of delay in the Commission's issuance of appellate decisions. At the time we concluded our initial examination, well over a third of all the cases on appeal to the Commission had been waiting for decision for over two years, and 20% of cases on appeal had been awaiting decision for over 900 days.

> With respect to some cases decided by the Commission this year, more than 3½ years passed between the time of the initial decision and the time of the Commission's decision. Each opinion typically goes through three layers of review, by the Assistant General Counsel, Associate General Counsel, and the General Counsel, each layer of review taking between five and twelve months. Finally, when the opinion gets to the Commission, sometimes no action is taken for many months.

Mem. from the Comm'n to Geovanni Prezioso, OGC, Regarding Policy for Accelerating the Admin. Procs. Process 1-2 (June 9, 2003). The SEC commissioners' blunt assessment elsewhere in that same 2003 memorandum—"*There is no justifiable explanation for such delays*," *id.* at 2 (emphasis added)—applies with equal force today.

In the case under review here, SEC's delay was not measured in mere days or even weeks. More than *four years* elapsed from the completion of briefing in Petitioners' appeal until SEC's decision, and that's not even counting the several years of FINRA regulatory examination, investigation, and litigation that preceded Petitioners' appeal to SEC. Stated otherwise, SEC took more than 5 times longer than the decision-making timeframe set forth in its own rule.

The most appropriate and effective remedy for SEC's egregious and wholly unexplained refusal to decide Petitioners' appeal in a timely

manner is to set aside SEC's final order with instructions that SEC, in turn, set aside FINRA's sanctions. When reviewing a final order issued by SEC, this Court has jurisdiction "to affirm or modify and enforce or to set aside the order." 15 U.S.C. § 78y(a)(3). Were the Court to "affirm … and enforce" SEC's order, it would implicitly condone one of SEC's most egregious examples of adjudicative delay, thereby emboldening the agency to continue with business as usual in pending and future cases before it. There is also no plausible way for the Court to "modify and enforce" SEC's final order in a manner that could effectively cure or unwind the more than 10 years that Petitioners had to endure their combined FINRA and SEC regulatory ordeal. And of course, any remand to SEC at this point for further substantive proceedings would only delay things further.

On the other hand, setting aside SEC's order would not only achieve a just outcome but also send an urgently needed message of judicial condemnation and serve as a wake-up call to SEC (and other lethargic agencies) that courts will not turn a blind eye to such extreme instances of administrative dereliction. Doing so would have little or no discernible

negative effect on the investing public, because Petitioners have already been effectively suspended from the securities business for at least the past six years, with associated financial and reputational damage that will not easily be repaired no matter how the Court rules.

## CONCLUSION

The Court should set aside SEC's final order and direct SEC to cancel the sanctions imposed by FINRA against Petitioners.

Dated: July 6, 2026

Respectfully submitted,

/s/ *Andrew J. Morris*
Andrew J. Morris (Counsel of Record)
Russell G. Ryan
Markham S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA  22203
(202) 869-5210
andrew.morris@ncla.legal

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,263 words. This brief also complies with the typeface and type-style requirements of the Federal Rule of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

July 6, 2026

/s/ *Andrew J. Morris*_____
Andrew J. Morris

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*

# CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ *Andrew J. Morris*_____
Andrew J. Morris

*Counsel for* Amicus Curiae
*New Civil Liberties Alliance*